# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT AND SEARCH WARRANT

1. I, Zachary Bryson, Task Force Officer of the Federal Bureau of Investigation (FBI), being duly sworn, depose and state that:

2. I am an investigator or law enforcement officer of the United States, within the meaning of Section 2510 (7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. I am a Detective with the Kentucky State Police (KSP), currently assigned as a Task Force Officer to the Federal Bureau of Investigation (FBI), Pikeville Resident Agency, since September 05, 2017. I have been employed by KSP since April 2010. In connection with my official FBI duties, I investigate criminal violations of federal narcotics laws, including, but not limited to, violations of Title 21, United States Code (U.S.C.), Sections 841 and 846. I have received training from KSP in Frankfort, Kentucky, covering a variety of investigative techniques, including interviewing, report writing, and an overview of statutes and criminal laws.

4. I have participated in numerous investigations involving the arrests of persons engaged in distributing controlled substances, including, but not limited to, marijuana, cocaine base, cocaine, heroin, fentanyl, methamphetamine, hydrocodone, and oxycodone, as well as firearm offenses. I have initiated or participated in surveillances, the operation and debriefing of numerous drug dealers, drug users, and informants, performed both physical and electronic surveillance, executed search warrants, analyzed records documenting the purchase and distribution of illegal drugs, and the concealment of illicit narcotics profits. Through my

training, education, experience, and consultations with other narcotics investigators and law enforcement officials, I have become familiar with the manner in which illegal drugs are obtained, financed, stored, manufactured, transported, and distributed, and the methods of payment for such drugs.

5. Throughout my experience, I have participated in numerous state and federal narcotics investigations. Through such investigations, I have been involved with the interviewing/debriefing of many witnesses, cooperating sources of information, and defendants regarding the modus operandi of drug traffickers. I have participated in investigations that utilized electronic monitoring, telephone toll analyses, document analyses, witness interviews, surveillance, controlled purchases of narcotics (both using cooperating sources and as an undercover officer), the execution of both federal and state search warrants, and the consensual searches of persons, premises, and vehicles utilized by drug traffickers. In all, I have been involved in more than 100 investigations regarding drug trafficking offenses.

6. Based on my training and experience, I am aware of the following facts:

7. It is common for drug traffickers to maintain records reflecting names, nicknames, addresses, and telephone numbers of current drug associates, or past drug co-conspirators, even though the drug trafficker has not dealt with a particular associate for an extended period of time.

8. Drug traffickers will accumulate and maintain substantial amounts of drug proceeds, specifically United States currency. They must have quick access to this currency or other liquid assets to maintain and finance their ongoing drug operation.

9. It is common for drug traffickers to conceal contraband, proceeds of drug transactions, and records reflecting names, nicknames, addresses, and telephone numbers of drug associates

within their residences, businesses, vehicles, or on the curtilage of their residences or businesses.

10. Drug traffickers often conceal within their vehicles, residences or businesses, or within the curtilage of their residences or businesses, caches of drugs, large amounts of currency, financial instruments, precious metals, gems, jewelry, electronic equipment, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money used in, or made from drug trafficking activities, and that courts have generally recognized that unexplained wealth is probative evidence of crimes motivated by greed, and in particular, of drug trafficking.

11. When drug traffickers amass significant proceeds from the sale of drugs, they will often attempt to legitimize these profits, and in the course of so attempting, will utilize domestic banks and their attendant services, including safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.

12. Drug traffickers often take, or cause to be taken, photographs or videos of themselves, their co-conspirators, their property and assets purchased with drug proceeds, and normally keep these photographs and videos in their possession, in their residences and/or in their place of business.

13. Drug traffickers often acquire, maintain or utilize firearms (including handguns, rifles, shotguns, and automatic weapons) during the course of their drug trafficking activities for several purposes, including but not limited to: receipt or use of firearms as payment for drugs bought or sold, to embolden the trafficker, to protect drug stashes and the proceeds of drug trafficking, to discourage aggressive negotiation from drug customers, to intimidate drug

competitors, to resist law enforcement operations, and to generally secure the drug trafficker's property.

14. This affidavit is based on information obtained through my own investigation of these matters as well as information provided to me by other federal, state, and local law enforcement officers who have participated in the investigation. I am familiar with all aspects of the investigation.

15. This affidavit contains information necessary to support probable cause for the requested search warrants and criminal complaints. The information contained herein is not intended to include each and every fact and matter observed by or known to the United States.

16. The investigation, described in more detail below, has demonstrated that there is probable cause to believe that Darin and Julie Sumner have violated 21 U.S.C. § 841(a)(1) by distributing cocaine base (also referred to herein is crack cocaine) and have violated 21 U.S.C. § 846 by conspiring together and with others to distribute cocaine base. Additionally, based on the facts set forth herein, I believe there is probable and reasonable cause that controlled substances, drug proceeds, and other evidence related to a conspiracy to distribute cocaine base are located at the residence of Darin and Julie Sumner, which is located at 1537 Jim Sumner Cemetery Road in Vicco, Kentucky, 41773, hereafter referred to as the TARGET RESIDENCE, more particularly described in Attachment A to this affidavit. It should also be noted that the residence referred to herein as the TARGET RESIDENCE is clearly marked by a road sign as being on Jim Sumner Cemetery Road. However, the TARGET RESIDENCE is also variously referred to, including on Darin and Julie Sumner's operator's licenses, as being located on George's Branch Road. Based on physical surveillance of the actual location, George's Branch Road appears to merely be a larger road close to Jim Sumner Cemetery Road, which is a smaller road that cuts off of George's Branch Road. I believe that 1537 Jim Sumner

Cemetery Road and 1537 George's Branch Road refers to the same residence, which is shown in the photograph herein and in Attachment A. I also believe, based on the facts set forth herein, that there is probable and reasonable cause that controlled substances, drug proceeds, and other evidence related to a conspiracy to distribute crack cocaine are located at the residence of Ashley and Wesley Dean Hensley, Jr., which is located at 52 Open Fork Road in Vicco, Kentucky, 41773, hereafter referred to as the TARGET RESIDENCE TWO, more particularly described in Attachment C to this affidavit. As a result, this composite affidavit is being submitted in support of the following: (1) a criminal complaint and arrest warrant for Darin Sumner; (2) a criminal complaint and arrest warrant for Julie Sumner; (3) a search warrant for the TARGET RESIDENCE; and (4) a search warrant for TARGET RESIDENCE TWO.

17. On or about December 16, 2025, this officer conducted a proffer interview with SOI 1. The identity of this officer was provided to SOI 1, and the subject identified Darin Sumner as the source of supply for illegal narcotics. SOI 1 reported that he/she had known Darin Sumner to distribute cocaine for many years, further detailing that Darin Sumner has sold drugs dating back to his/her childhood years.

18. On or about February 13, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that he/she had been to the TARGET RESIDENCE on prior occasions. Additionally, they believed that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner. It should noted that on multiple occasions during the course of this investigation, CW 1 has verified by reference to their operator's license that he knew the identity of Darin and Julie Sumner.

19. On or about February 13, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in pre-recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

20. Law enforcement drove CW 1 to the bottom of the hill off Georges Branch Road and observed CW 1 walk up Jim Sumner Cemetery Road towards the direction of the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed to walk back from the vicinity of the TARGET RESIDENCE and entered the undercover vehicle that was occupied by law enforcement. CW 1 provided a clear plastic bag with a “bread tie” around the top, containing a white rock substance. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

21. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed that CW 1 traveled to the TARGET RESIDENCE during the controlled drug transaction. The covert video indicated that Julie Sumner, Darrin Sumner’s wife, was present inside the TARGET RESIDENCE, and the video indicated that Julie Sumner accepted the KSP Drug Buying Monies from CW 1. Lastly, it was further suspected that CW 1 obtained a quantity of cocaine from Julie Sumner on the porch area of the TARGET RESIDENCE.

22. During the debrief after the conclusion of the controlled drug transaction, CW 1 reported that the substance he/she purchased was “crack.” CW 1 confirmed that he/she traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived, he/she contacted Julie Sumner on the porch area of the TARGET RESIDENCE. CW 1 confirmed that he/she provided $350.00 in KSP drug buying money to Julie Sumner and additionally confirmed that Julie

Sumner provided the suspected cocaine to CW 1. CW 1 reported that no one else was present during the controlled drug transaction, and that there were no other participants involved in this transaction.

23. On or about February 24, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that he/she had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

24. On or about February 24, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected Crack Cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in pre-recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

25. Law enforcement drove CW 1 to the bottom of the hill off Georges Branch Road and observed CW 1 walk up Jim Sumner Cemetery Road towards the direction of the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed to walk back from the vicinity of the TARGET RESIDENCE and entered the undercover vehicle that was occupied by law enforcement. CW 1 provided a clear plastic bag with a “bread tie” around the top, containing a white rock substance. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

26. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed that CW 1 traveled to the TARGET RESIDENCE during the controlled drug transaction. The covert recording indicated that CW 1 contacted Julie Sumner, Darrin Sumner’s wife, and further indicated that Julie Sumner was present inside the TARGET

RESIDENCE. Lastly, it was further suspected that CW 1 obtained a quantity of cocaine from Julie Sumner on the porch area of the TARGET RESIDENCE.

27. During the debrief after the conclusion of the controlled drug transaction, CW 1 confirmed that he/she traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived, he/she contacted Julie Sumner on the porch area of the TARGET RESIDENCE. CW 1 confirmed that he/she provided $350.00 in KSP drug-buying money to Julie Sumner and additionally confirmed that Julie Sumner provided the suspected cocaine to CW 1. Additionally, CW 1 reported that he/she contacted Darin Sumner on the previous date and arranged to purchase one eight-ball quantity of crack cocaine from Darin Sumner on the date of the controlled drug transaction. CW 1 reported that no one else was present during the controlled drug transaction, and that there were no other participants involved in this transaction.

28. On or about February 26, 2026, this officer conducted a proffer interview with SOI 2. The identity of this officer was provided to SOI 2, and the subject identified Darin Sumner as a major source of supply for cocaine in Perry County, Kentucky. SOI 2 advised that the Sumners live off George's Branch and described the Sumners as being just as big as "Frank Campbell. "It should be noted that this officer was personally involved in the investigation of the Frank Campbell drug trafficking organization (DTO) and both Frank Campbell and various members of his DTO were charged and have since pled guilty to having distributed multi-kilogram quantities of both powdered and crack cocaine in Perry County, Kentucky. SOI 2 reported that he/she had purchased cocaine from Darrin Sumner. SOI 2 advised that it was his/her understanding that law enforcement had recently arrested Sumner's son, DJ, for "selling dope." In reference to his/her prior drug purchase from Sumner, SOI 2 estimated that he/she had purchased approximately one (1) gram from Sumner. SOI 2 further advised that "he's (Sumner)

always got it," and further detailed that Sumner is capable of having a kilo or maybe more of cocaine.

29. On or about March 04, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that he/she had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug buying monies, they could purchase a quantity of crack cocaine from Darin Sumner.

30. On or about March 04, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected Crack Cocaine from Darin Sumner for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in pre-recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

31. Law enforcement drove CW 1 to the bottom of the hill off Georges Branch Road and observed CW 1 walk up Jim Sumner Cemetery Road towards the direction of the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed to walk back from the vicinity of the TARGET RESIDENCE and entered the undercover vehicle that was occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

32. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed CW 1 traveled to the TARGET RESIDENCE during the controlled drug transaction. The covert video indicated that Darin Sumner asked CW 1, "You want three fifty?" Lastly, it was further suspected that CW 1 obtained a quantity of cocaine from Darin Sumner on the porch area of the TARGET RESIDENCE.

33. During the debrief after the conclusion of the controlled drug transaction, CW 1 reported that the substance he/she purchased was "crack." CW 1 confirmed that he/she traveled to the TARGET RESIDENCE. CW 1 advised that the controlled drug transaction was conducted on the porch area of the TARGET RESIDENCE. CW 1 confirmed that he/she provided $350.00 in KSP drug buying money to Darin Sumner and additionally confirmed that Darin Sumner provided the suspected Cocaine to CW 1. CW 1 reported that no one else was involved in this transaction.

34. On or about March 06, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that he/she had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug buying monies, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

35. On or about March 06, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine from Darin Sumner for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in pre-recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

36. Law enforcement drove CW 1 to the bottom of the hill off Georges Branch Road and observed CW 1 walk up Jim Sumner Cemetery Road towards the direction of the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed to walk back from the vicinity of the TARGET RESIDENCE and entered the undercover vehicle that was occupied by law enforcement. CW 1 provided a clear plastic bag with a "bread tie" around the top, containing a white rock substance. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

37. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed that CW 1 traveled to the TARGET RESIDENCE during the controlled drug transaction.

38. During the debrief after the conclusion of the controlled drug transaction, CW 1 reported that the substance he/she purchased was “crack.” CW 1 confirmed that he/she traveled to the TARGET RESIDENCE. CW 1 confirmed that he/she provided $350.00 in KSP drug buying money to Darin Sumner and additionally confirmed that Darin Sumner provided the suspected cocaine to CW 1. CW 1 reported that no one else was present during the controlled drug transaction, and that there were no other participants involved in this transaction.

39. On or about March 09, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug buying monies, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

40. On or about March 09, 2026, law enforcement utilized CW 1 to purchase a quantity of crack cocaine for $200.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $200.00 in recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

41. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 drove his/her vehicle to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and then entered the undercover vehicle occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a white colored bread tie. The

substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

42. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed that CW 1 traveled to the TARGET RESIDENCE and contacted Darin Sumner during the controlled drug transaction.

43. During the debrief after the conclusion of the controlled drug transaction, CW 1 reported that the substance he/she purchased was “crack.” CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Darin Sumner. CW 1 confirmed that he/she provided $200.00 in KSP drug-buying money to Darin Sumner and additionally confirmed that Darin Sumner provided the suspected crack cocaine to CW 1. CW 1 reported that no one else was present during the controlled drug transaction, and that there were no other participants involved in this transaction. CW 1 further advised that he/she provided the pre-recorded KSP drug-buying money to Darin Sumner on the porch area of the target residence, and Sumner was inside the TARGET RESIDENCE.

44. On or about March 18, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug buying monies, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

45. On or about March 18, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds.

Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

46. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 drove his/her vehicle to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and then entered the undercover vehicle occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

47. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed that CW 1 traveled to the TARGET RESIDENCE and contacted Julie Sumner during the controlled drug transaction.

48. During the debrief after the conclusion of the controlled drug transaction, CW 1 reported that the substance he/she purchased was “crack.” CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Julie Sumner. CW 1 confirmed that he/she provided $350.00 in KSP drug-buying money to Julie Sumner and additionally confirmed that Julie Sumner provided the suspected crack cocaine to CW 1 on the porch area of the TARGET RESIDENCE. CW 1 reported that he/she arranged this controlled drug transaction to occur on the previous date with Darin Sumner. CW 1 reported that no other participants were involved in this transaction.

49. On or about March 24, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally,

it was their belief that if they were provided with a quantity of KSP drug buying monies, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

50. On or about March 24, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

51. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 drove his/her vehicle to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and entered the undercover vehicle that was occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a white colored bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

52. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed that CW 1 traveled to the TARGET RESIDENCE during the controlled drug transaction.

53. During the debrief after the conclusion of the controlled drug transaction, CW 1 reported that the substance he/she purchased was cocaine. CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE and referred to the TARGET RESIDENCE as “Darin’s.” CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Darin Sumner. CW 1 confirmed that he/she provided $350.00 in KSP drug buying money to Darin

Sumner and additionally confirmed that Darin Sumner provided the suspected crack cocaine to CW 1. CW 1 reported that there were no other participants involved in this transaction.

54. On or about April 07, 2026, this officer conducted a proffer interview with SOI 3. The identity of this officer was provided to SOI 3, and the subject identified Sumner as a major source of supply for illegal narcotics in Perry County, Kentucky. This officer asked SOI 3 during the proffer interview, "Is there anyone in Perry County selling cocaine that is comparable in size to you or is a large dealer?" SOI 3 responded, "Darin Sumner."

55. Additionally, SOI 3 reported that he/she knows Sumner and further stated that he/she knows Sumner to possess machinery-type equipment, a side-by-side, and multiple vehicles. SOI 3 reported that Sumner lives off Georges Branch in Vicco, Kentucky. SOI 3 reported that Sumner has been selling drugs for approximately 7-8 years. SOI 3 further detailed that "everybody has been talking about him" (Sumner) and further advised that Sumner "sells garbage." This statement was a reference to the quality and purity of the drugs being sold by Sumner. SOI 3 further reported that there were occasions where he/she had even provided money to his/her associates to purchase "crack from Darren." SOI 3 further detailed that he/she had provided money to his/her associates on at least 2-3 occasions and further provided that his/her associates had purchased $100.00 to $150.00 personal use quantities from Sumner. SOI 3 reported that Sumner is married and has a son. SOI 3 further detailed that it was his/her understanding that on one occasion Sumner's son even "took a charge for him." Lastly, SOI 3 reported that Sumner "is wide open. "This officer recognizes this reference as meaning that Sumner is constantly and very actively selling illegal narcotics.

56. On or about April 09, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally,

it was their belief that if they were provided with a quantity of KSP drug buying monies, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

57. On or about April 09, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

58. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 walked on foot to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and then entered the undercover vehicle occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of cocaine base.

59. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed that CW 1 traveled to the TARGET RESIDENCE during the controlled drug transaction.

60. During the debrief after the conclusion of the controlled drug transaction, CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Darin Sumner. CW 1 confirmed that he/she purchased the suspected crack cocaine from Darin Sumner on the porch area of the TARGET RESIDENCE using the $350.00 in KSP drug-buying money. CW 1 reported that there were no other participants involved in this transaction.

61. On or about April 15, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

62. On or about April 15, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

63. Law enforcement drove CW 1 to the bottom of the hill off Georges Branch Road and observed CW 1 walk up Jim Sumner Cemetery Road towards the direction of the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed to walk back from the vicinity of the TARGET RESIDENCE and entered the undercover vehicle that was occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a white colored bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

64. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed CW 1 traveled to the TARGET RESIDENCE during the controlled drug transaction. Lastly, the covert video indicated that Darin Sumner was present, accepted the KSP drug-buying money from CW 1, and it was further suspected that CW 1 obtained a quantity of crack cocaine from Darin Sumner at the TARGET RESIDENCE.

65. During the debrief after the conclusion of the controlled drug transaction, CW 1 reported that the substance he/she purchased was "crack." CW 1 confirmed that he/she traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived, he/she contacted Darin Sumner outside of the TARGET RESIDENCE. CW 1 confirmed that he/she provided $350.00 in KSP drug-buying money to Darin Sumner and additionally confirmed that Darin Sumner provided the suspected Crack Cocaine to CW 1. CW 1 reported that there were no other participants involved in this transaction.

66. On or about April 23, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

67. On or about April 23, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

68. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 walked on foot to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and then entered the undercover vehicle occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

69. During the debrief after the conclusion of the controlled drug transaction, CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Darin Sumner. CW 1 confirmed that he/she purchased the suspected crack cocaine from Darin Sumner at the TARGET RESIDENCE using the $350.00 in KSP drug-buying money. CW 1 reported that there were no other participants involved in this transaction.

70. On or about May 05, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

71. On or about May 05, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

72. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 walked on foot to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and then entered the undercover vehicle occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

73. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed CW 1 traveled to the TARGET RESIDENCE during the controlled drug transaction. Lastly, the covert video indicated that Darin Sumner was present, the video indicated that Darin Sumner reached the KSP drug-buying money towards the direction Darin Sumner was seated, and it was further suspected that CW 1 obtained a quantity of crack cocaine from Darin Sumner at the TARGET RESIDENCE.

74. During the debrief after the conclusion of the controlled drug transaction, CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Darin Sumner. CW 1 confirmed that he/she purchased the suspected crack cocaine from Darin Sumner on the porch area TARGET RESIDENCE using the $350.00 in KSP drug-buying money. CW 1 reported that there were no other participants involved in this transaction, however Julie Sumner was present during the controlled drug transaction.

75. On or about May 05, 2026, after the conclusion of this controlled drug transaction, this officer and Detective Joshua Richardson conducted a brief historical interview with CW 1 (that was not recorded). CW 1 provided to law enforcement that he/she had been purchasing cocaine and crack cocaine from Sumner for approximately 20 years. CW 1 advised that the most crack cocaine that he/she had ever purchased from Sumner was approximately a ¼ to ½ ounce. Additionally, CW 1 advised that Sumner typically sells crack cocaine for $100.00 per gram.

76. Additionally, CW 1 reported that Sumner was utilizing another residence that is located on Open Fork Road off Georges Branch Road as a residence to store both drugs and drug proceeds. CW 1 further reported that the drugs and monies stored at the second residence (in the photograph below) are being utilized in Sumner's overall drug conspiracy occurring from the

TARGET RESIDENCE. Based on the information provided by CW 1, I believe that the second residence being used by Sumner to further his drug trafficking activities is TARGET RESIDENCE TWO).

77. CW 1 advised that Sumner's niece, Ashley Hensley, and Wesley Hensley live TARGET RESIDENCE TWO. CW 1 further stated that Ashley Hensley works at Vicco Water Company, and her husband, Wesley, works as a coal miner.

78. CW 1 stated that Sumner keeps approximately 3-4 ounces of crack cocaine inside the TARGET RESIDENCE. CW 1 further stated that when Sumner needs to "reup" or obtain additional monies, Wesley will bring either the drugs or the US currency to Sumner at the TARGET RESIDENCE.

79. On or about May 14, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

80. On or about May 14, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

81. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 walked on foot to the TARGET RESIDENCE. Shortly thereafter, CW

1 was observed walking on Georges Branch Road and then entered the undercover vehicle occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a white colored bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

82. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed that CW 1 traveled to the TARGET RESIDENCE and contacted Darin Sumner during the controlled drug transaction.

83. During the debrief after the conclusion of the controlled drug transaction, CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Darin Sumner. CW 1 confirmed that he/she purchased the suspected crack cocaine from Darin Sumner at the TARGET RESIDENCE using the $350.00 in KSP drug-buying money. CW 1 reported that there were no other participants involved in this transaction.

84. On or about May 14, 2026, members of KSP and the Federal Bureau of Investigation (FBI) HEAT Task Force conducted a "knock and talk" at a residence in Letcher County, Kentucky, after information had been obtained that the subject was involved in the distribution of narcotics from his residence. As a result of the "knock and talk," law enforcement obtained consent to search the residence and property in question, and investigators located approximately one ounce of cocaine and approximately $1600.00 in U.S. currency.

85. On or about May 19, 2026, this officer and Detective Joshua Richardson contacted CW 1 in the Vicco Community of Perry County, Kentucky. CW 1 reported that Sumner was extremely

nervous and cautious at the present time due to recent law enforcement activity that had occurred in a neighboring county. Specifically, CW 1 advised that it was his/her understanding that law enforcement officers had executed enforcement actions resulting in the seizure of illegal narcotics and U.S. currency from another individual at a separate residence in Letcher County, Kentucky, who was selling cocaine being provided by Sumner. According to CW 1, these law enforcement actions caused Sumner to become increasingly apprehensive and cautious regarding his illegal activities. When asked, "If Sumner was nervous?" CW 1 responded by saying, "Hell yes he's nervous, they took Darin's money from there."

86. On or about May 19, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

87. On or about May 19, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected Crack Cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

88. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 walked on foot to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and then entered the undercover vehicle occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a white colored bread tie. The substance

was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

89. During the debrief after the conclusion of the controlled drug transaction, CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Darin Sumner. CW 1 further provided that Darin Sumner was accompanied by another male subject, only identified by CW 1 as "Stevie." CW 1 confirmed that he/she purchased the suspected crack cocaine directly from Darin Sumner at the TARGET RESIDENCE using the $350.00 in KSP drug buying money. CW 1 reported that there were no other participants involved in this transaction.

90. On or about May 22, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected Crack Cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

91. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 walked on foot to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and then entered the undercover vehicle occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

92. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed that CW 1 traveled to the TARGET RESIDENCE and contacted Darin Sumner during the controlled drug transaction.

93. During the debrief, after the conclusion of the controlled drug transaction, CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Darin Sumner. CW 1 confirmed that he/she purchased the suspected crack cocaine directly from Darin Sumner at the TARGET RESIDENCE using the $350.00 in KSP drug buying money. CW 1 reported that there were no other participants involved in this transaction.

94. On or about May 22, 2026, after the conclusion of the controlled drug transaction, this officer conducted a brief historical interview with CW 1. CW 1 provided to this officer that Sumner is being assisted in the distribution of cocaine in the Eastern District of Kentucky by his wife, Julie Sumner, DJ Sumner, Darin Sumner's son, and Ernest Back Jr. also known by an alias of "Feller Back." CW 1 provided that Sumner obtains crack cocaine from his primary SOS located near Detroit, Michigan. CW 1 further stated that the SOS is an African American male whom he/she knows only by the alias "Tony."

95. Law enforcement has determined through a prior federal investigation that was occurring in the Eastern District of Kentucky that an African American male identified as "Tony Williams" was actively transporting narcotics into both Perry and Letcher County, Kentucky.

96. Law enforcement displayed an operator license photograph of Tony Williams to CW 1, and it should be noted that CW 1 positively identified Tony Williams as Sumner's primary SOS. CW

1 advised that Tony Williams routinely transports multiple-pound quantities of crack cocaine to the TARGET RESIDENCE on a monthly basis.

97. Additionally, CW 1 further detailed that on one occasion, Sumner even traded a vehicle for approximately eighteen (18) ounces of crack cocaine.

98. Using this information, law enforcement investigators contacted Kentucky State Police Intel analysts for assistance in identifying any and all vehicle registration history between the Sumner(s) and Tony Williams. It should be noted that KSP Intel Analysts using vehicle registration programs (NCIC) determined that a 2014 Chevrolet Silverado K-1500 High Country pickup truck registered to Julie Sumner was transferred and titled to Tony Davell Williams, a resident of Taylor, Michigan, on or about May 05, 2026.

99. CW 1 advised that he/she has routinely observed "Tony" being accompanied to the TARGET RESIDENCE by a Perry County resident identified as “Feller Back.” CW 1 reported that it was his/her understanding that “Feller Back” receives some monetary compensation for assisting with the transportation of the narcotics to the TARGET RESIDENCE.

100. On or about May 28, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

101. On or about May 28, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds. Additionally,

law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

102. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 walked on foot to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and then entered the undercover vehicle occupied by law enforcement. CW 1 provided a clear plastic bag containing a white powder and solid substance. The plastic baggie was sealed shut with a white colored bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance contained the presence of cocaine and ibuprofen.

103. A review of the controlled drug transaction was conducted by law enforcement and the audio detected from the covert recording device indicated that CW 1 traveled to the TARGET RESIDENCE and interacted with both Darin Sumner and Julie Sumner during the controlled drug transaction.

104. During the debrief after the conclusion of the controlled drug transaction, CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Darin Sumner outside of the TARGET RESIDENCE. CW 1 confirmed that he/she purchased the suspected crack cocaine from Darin Sumner using the Kentucky State Police drug buying money that was provided by law enforcement. CW 1 reported that Julie Sumner was present during the controlled drug transaction, however, Julie did not participate in this transaction

105. On or about June 11, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally,

it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

106. On or about June 11, 2026, law enforcement utilized CW 1 to purchase a quantity of suspected crack cocaine from either Darin or Julie Sumner for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

107. Law enforcement drove CW 1 to the vicinity of Jim Sumner Cemetery Road off Georges Branch Road, and CW 1 walked on foot to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and then entered the undercover vehicle occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a white colored bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

108. A review of the controlled drug transaction was conducted by law enforcement, and it was determined that there was a recorder malfunction during the controlled drug transaction.

109. During the debrief after the conclusion of the controlled drug transaction, CW 1 confirmed that he/she had traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived at the TARGET RESIDENCE, he/she contacted Julie Sumner. CW 1 confirmed that he/she purchased the suspected crack cocaine from Julie Sumner at the TARGET RESIDENCE. CW 1 reported that there were no other participants involved in this transaction.

110. On or about June 30, 2026, this officer and Detective Joshua Richardson contacted CW 1 in the Vicco Community of Perry County, Kentucky. CW 1 provided to law enforcement that on or about June 28, 2026, he/she observed the SOS, Tony Williams, and Feller Back arrive at the TARGET RESIDENCE. CW 1 further provided that both subjects were driving separate vehicles. CW 1 detailed that the SOS was driving a black Chevrolet pick-up truck with Michigan registration plates.

111. CW 1 further provided that he/she observed "Feller Back" and the SOS enter inside the TARGET RESIDENCE, and CW 1 further detailed that he/she observed Feller Back carry two duffle bags inside the TARGET RESIDENCE, which contained vacuum-sealed bags. CW 1 provided that he/she observed crack cocaine inside the vacuum-sealed bags. Additionally, CW 1 stated that he/she observed DJ Sumner, Darin Sumner's son, take a quantity of powdered cocaine from the TARGET RESIDENCE. CW 1 advised law enforcement that Feller Back informed him/her that the SOS had transported approximately 6-7 kilograms of crack cocaine down from Michigan, but Sumner wasn't receiving all of the crack cocaine. CW 1 further detailed that the SOS had also brought approximately 422 Oxycodone 30 mg tablets and approximately 411 IR 10 Oxycodone tablets, which he sold at the TARGET RESIDENCE for approximately $8,000.00. CW 1 advised law enforcement it was his/her understanding that Feller Back took a quantity of the Oxycodone tablets. Lastly, CW 1 provided law enforcement with Sumner's telephone number, stating it was 606-216-5469.

112. On or about July 01, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

113. On or about July 01, 2026, law enforcement utilized CW 1 to purchase a quantity of crack cocaine from either Darin or Julie Sumner for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in pre-recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

114. Law enforcement drove CW 1 to the bottom of the hill off Georges Branch Road and observed CW 1 walk up Jim Sumner Cemetery Road towards the direction of the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed to walk back from the vicinity of the TARGET RESIDENCE and entered the undercover vehicle that was occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a white colored bread tie. The substance was sent to the Kentucky State Police Forensic Laboratory. The lab confirmed the substance to contain the presence of a cocaine base.

115. During the debrief after the conclusion of the controlled drug transaction, CW 1 reported that the substance he/she purchased was "crack cocaine." CW 1 confirmed that he/she traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived, he/she contacted Darin Sumner. CW 1 further clarified that he/she was standing on the porch area of the TARGET RESIDENCE and Darin Sumner went inside the TARGET RESIDENCE to obtain the crack cocaine that was purchased during the controlled drug transaction. CW 1 reported that there were no other participants involved in this transaction.

116. On or about July 31, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally,

it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

117. On or about July 31, 2026, law enforcement utilized CW 1 to purchase a quantity of crack cocaine from either Darin or Julie Sumner for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in pre-recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

118. Law enforcement drove CW 1 to the bottom of the hill off Georges Branch Road and observed CW 1 walk up Jim Sumner Cemetery Road towards the direction of the TARGET RESIDENCE and CW 1 received a ride to the TARGET RESIDENCE, up the hill, from another male subject that was traveling to the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and entered the undercover vehicle that was occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a white colored bread tie. The substance has been sent to the Kentucky State Police Forensic Laboratory. At this present time the lab results are pending. However, through this officers training and experience in narcotics investigations the substance that was purchased was consistent with the physical characteristics of what I know to be a substance that contains a detectable amount of cocaine base.

119. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed CW 1 traveled to the TARGET RESIDENCE during the controlled drug transaction.

120. During the debrief after the conclusion of the cont rolled drug transaction, CW 1 reported that the substance he/she purchased was “crack cocaine.” CW 1 confirmed that he/she traveled to

the TARGET RESIDENCE. CW 1 advised that when he/she arrived, he/she contacted Darin Sumner. CW 1 further clarified that he/she was standing on the porch area of the TARGET RESIDENCE and Darin Sumner was inside of the TARGET RESIDENCE. CW 1 confirmed that he/she provided $350.00 in KSP drug buying money to Sumner and additionally confirmed that Julie Sumner "bagged up" the suspected crack cocaine. CW 1 reported that after Julie Sumner prepared the substance to be purchased Darin Sumner then provided the suspected crack cocaine to CW 1. CW 1 reported that there were no other participants involved in this transaction.

121. Additionally, on or about July 31, 2026, CW 1 provided to law enforcement, off- recording, that 1 ½ weeks before this date, Sumner had a Smith and Wesson .38 caliber revolver inside the TARGET RESIDENCE.CW 1 further detailed that it is common for Sumner to take in items on pawn when they are purchasing cocaine or pills from him and detailed that the subjects will bring money back to Sumner and he will give the subjects pawned items back to them. CW 1 advised that the .38 caliber Smith and Wesson handgun had belonged to Violet Crutcher. Lastly, CW 1 further stated that it was his or her understanding that Violet Crutcher had been back to the TARGET RESIDENCE and had provided Sumner with money, and that Sumner had provided Crutcher with her pawned handgun.

122. On or about August 21, 2026, CW 1 reported to KSP controlling investigator Detective Joshua Richardson that they had been to the TARGET RESIDENCE on prior occasions. Additionally, it was their belief that if they were provided with a quantity of KSP drug-buying money, they could purchase a quantity of crack cocaine from either Darin or Julie Sumner.

123. On or about August 21, 2026, law enforcement utilized CW 1 to purchase a quantity of crack cocaine from either Darin or Julie Sumner for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in pre-recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

124. Law enforcement drove CW 1 to the bottom of the hill off Georges Branch Road and observed CW 1 walk up Jim Sumner Cemetery Road towards the direction of the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and entered the undercover vehicle that was occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a white colored bread tie. The substance has been sent to the Kentucky State Police Forensic Laboratory. At this present time the lab results are pending. However, through this officers training and experience in narcotics investigations the substance that was purchased was consistent with the physical characteristics of what I know to be a substance that contains a detectable amount of a cocaine base.

125. During the debrief after the conclusion of the controlled drug transaction, CW 1 reported that the substance he/she purchased was “crack cocaine.” CW 1 confirmed that he/she traveled to the TARGET RESIDENCE. CW 1 confirmed that he/she provided $350.00 in KSP drug buying money to Darin Sumner and additionally confirmed that Darin Sumner provided the suspected crack cocaine that was purchased to CW1. CW 1 reported that there were no other participants involved in this transaction.

126. Additionally, law enforcement officers conducted a check of records in the possession of the Perry County Clerk's Office and located a Deed of Conveyance indicating that the TARGET RESIDENCE, for the property in question, reflects Julie Sumner as the sole grantee/owner. However, it should be noted that there other property deeds reviewed which indicate that Julie Sumner and Darin Sumner are listed jointly as owners of additional properties.

127. On or about September 11, 2026, law enforcement utilized CW 1 to purchase a quantity of crack cocaine from either Darin or Julie Sumner for $350.00. Before the purchase, law enforcement conducted a search of CW 1 and issued CW 1 $350.00 in pre-recorded Kentucky State Police Drug Buying funds. Additionally, law enforcement equipped CW 1 with a covert audio/video recording device to document events outside law enforcement's presence.

128. Law enforcement drove CW 1 to the bottom of the hill off Georges Branch Road and observed CW 1 walk up Jim Sumner Cemetery Road towards the direction of the TARGET RESIDENCE. Shortly thereafter, CW 1 was observed walking on Georges Branch Road and entered the undercover vehicle that was occupied by law enforcement. CW 1 provided a clear plastic bag containing a white rock substance. The plastic baggie was sealed shut with a bread tie. The substance has been sent to the Kentucky State Police Forensic Laboratory. At this present time the lab results are pending. However, through this officers training and experience in narcotics investigations the substance that was purchased was consistent with the physical characteristics of what I know to be a substance that contains a detectable amount of cocaine base.

129. A review of the controlled drug transaction was conducted by law enforcement, and it was confirmed CW 1 traveled to the TARGET RESIDENCE during the controlled drug transaction.

130. During the debrief after the conclusion of the controlled drug transaction, CW 1 reported that the substance he/she purchased was "crack cocaine." CW 1 confirmed that he/she traveled to the TARGET RESIDENCE. CW 1 advised that when he/she arrived, he/she contacted Julie Sumner. CW 1 further clarified that he/she was standing on the porch area of the TARGET RESIDENCE and Julie Sumner was inside of the TARGET RESIDENCE. CW 1 confirmed that he/she provided $350.00 in KSP drug buying money to Julie Sumner and additionally confirmed that Julie Sumner provided the suspected crack cocaine to CW 1. CW 1 reported to law enforcement that he/she initially arranged the transaction to occur with Darin Sumner; however, Darin Sumner was away from the residence at the time of the controlled drug transaction. CW 1 reported that there were no other participants involved in this transaction.

131. Additionally, on or about September 11, 2026, Kentucky State Police Detectives Zachary Bryson, Josh Richardson, and David Slone conducted a brief historical interview with CW 1.

132. CW 1 was asked to provide additional details regarding what he/she recalled about prior police activity that occurred in Letcher County, Kentucky, involving Darin Sumner. It should be noted that CW 1 had previously discussed this information with law enforcement in or about May 2026.

133. CW 1 stated that Darin Sumner told him/her that the state police responded to the residence of an individual known to CW 1 only as "Stevie." CW 1 further advised that Stevie's daughter was in a relationship with Darin Sumner's son, DJ.

134. CW 1 was shown a photograph obtained from a Kentucky operator's license photograph of Stevie Johnson, with no identifying information visible. CW 1 positively identified Stevie Johnson as the individual referred to as "Stevie."

135. CW 1 advised that, according to Darin Sumner, prior to law enforcement making contact at the residence, Stevie's stepson fled the Letcher County residence carrying a box that contained a quantity of money and drugs. CW 1 stated that the stepson hid the box but later returned and retrieved it for law enforcement.

136. CW 1 further stated that, in his/her opinion, DJ was likely receiving money from the operation. CW 1 also advised that he/she personally witnessed Stevie and DJ come to Darin Sumner's residence (TARGET RESIDENCE) and obtain drugs.

137. CW 1 stated that Darin Sumner became nervous after Stevie's residence was raided because Darin Sumner only knew Stevie through DJ.

138. On or about September 11, 2026, CW 1 also informed detectives that Wesley (Hensley) brought 3 or 4 ounces of crack (cocaine) to Darin's (TARGET RESIDENCE) yesterday. CW 1 advised that during this incident, Wesley was driving a dirtbike. CW 1 detailed Wesley's vehicles as a black Dodge Ram pick-up truck and a Tahoe. CW 1 explained that Darin uses Wesley and his niece because he trusts them and tries to take care of them because they take care of his granddaughter. Additionally, CW 1 stated that a week ago, Tony Williams was looking at Darin's Charger. He was present when Darin told Feller Back that if "he," referring to Tony Williams, brought him two kilos, he would let him have the Charger. CW 1 also stated that Feller (Back) delivers to a guy in Letcher County named Stuart. CW 1 further reported that Darin told him, "Tony gave him (Sumner) 38 ounces a kilo." I understand this to mean that in a deal for a kilogram of crack cocaine Tony supplies Darin with additional ounces of cocaine beyond just the agreed upon kilogram.

139. CW 1 also told law enforcement that DJ's daughter had a cabin on the hill behind Sumner's residence.

140. CW 1 stated that Tony came most often on Tuesday or Friday. CW 1 told law enforcement that Darin keeps dope all the time and further detailed that Darin said, "he could quit right now and had enough money to do him the rest of his life." CW 1 told detectives that Darin Sumner bought his property from Dwight Amburgey.

141. CW 1 told detectives about a certain customer that would regularly come to Sumner's home to obtain drugs. CW1 didn't know this person's name but described them as a female in a solid white Lincoln who was tied to ACE Chaney. CW 1 stated that this person charges $3000.00-$4,000.00 at a time in drugs.

142.



143. This officer displayed the residential photograph shown above to CW 1. This officer believes that the residence depicted above is the TARGET RESIDENCE and furthermore that the residence is located on Jim Sumner Cemetery Road, off Georges Branch Road in Vicco,

Kentucky. CW 1 advised that this residence is the residence where he/she has conducted all of the controlled drug transactions associated with this investigation and further stated that he/she knows this residence to be inhabited by Darin and Julie Sumner.

144.



145. Additionally, this officer displayed the residential photograph of TARGET RESIDENCE TWO shown above to CW 1. CW 1 reported that Darin Sumner was utilizing TARGET RESIDENCE TWO, which is located on Open Fork Road off Georges Branch Road, as a residence to store both bulk drugs quantities and drug proceeds which Sumner amasses from the sale of drugs from TARGET RESIDENCE. CW 1 reported that TARGET RESIDENCE TWO is inhabited by Ashley and Wesley Hensley. CW 1 further reported that the drugs and monies stored at TARGET RESIDENCE TWO (in the photograph above) are being utilized in Sumner's overall drug conspiracy occurring from the TARGET RESIDENCE.

146. CW 1 advised that Sumner's niece, Ashley Hensley, and Wesley Hensley live inside TARGET RESIDENCE TWO. CW 1 further stated that Ashley Hensley works at Vicco Water Company, and her husband, Wesley, works as a coal miner.

147. CW 1 stated that Sumner keeps approximately 3-4 ounces of crack cocaine inside the TARGET RESIDENCE. CW 1 further stated that when Sumner needs to "reup" from the bulk drug quantity or obtain additional monies, Wesley will bring either item requested to Sumner at the TARGET RESIDENCE.

148. CW 1 reported that he/she knew this activity to have occurred on or about September 10, 2026. On or about this date, CW 1 advised that he/she witnessed Wesley (Hensley) bring 3-4 ounces of crack (cocaine) to Darin at the TARGET RESIDENCE. CW 1 advised that during this incident, Wesley was driving a dirtbike. CW 1 explained that Darin Sumner uses Wesley and his niece in this conspiracy, because he trusts them and tries to take care of them because they take care of his granddaughter.

149. During a prior interview conducted, CW 1 provided the telephone number (606-216-5469) he/she knows to be utilized by Darin Sumner. This phone number was provided to intelligence analysts for further review. It should be reported that the phone number provided by CW 1 was confirmed to be registered to a subscriber account in the name of Julie Sumner. An analysis of telephone records associated with this number was conducted. The period of time requested in the subpoena was for phone records occurring on or about May 09, 2026, through July 08, 2026. It was further reflected that the telephone number registered with Julie Sumner had contacted Ashley and Wesley Hensley a combined total of 34 times.

150. On or about September 18, 2026, this officer requested the confirmation of the residential address associated with the Kentucky Operators License(s) for Ashley and Wesley Hensley from Kentucky State Police Intel. It should be noted that Kentucky State Police Intel reported that Ashley Hensley and Wesley Dean Hensley Jr both reported on their Kentuck Operator's License registration that their residential address is located at 52 Open Fork Road in Vicco, Kentucky, which is the address of TARGET RESIDENCE TWO.

151. On or about October 6, 2026, an additional historical interview was conducted with CW 1. During the interview, CW 1 traveled with officers to Open Fork Road located off Georges Branch Road, and identified TARGET RESIDENCE TWO as the residence that CW 1 knew to be the residence of Ashley and Wesley Hensley, Jr. CW 1 provided some information as to how CW 1 knew that. CW 1 advised that they had assisted in packing a safe into TARGET RESIDENCE TWO. CW 1 stated the safe was grayish blue, or "gunmetal." CW 1 stated the safe was installed in the residence a couple of years ago and further detailed that it was around the time police seized money from the residence of Brandon Sumner, who is Darin Sumner's son. CW 1 stated that on this day Stevie Costello approached CW 1. CW 1 stated that Stevie came down and told them Darin said to come help him put a safe in the house. CW 1 stated they asked Stevie who got a safe, and Stevie told them that Darin got one and was going to put it in Ashley and Wesley's residence. The CW stated that they traveled down to TARGET RESIDENCE TWO with Stevie Costello on a side-by-side (utility vehicle). CW 1 stated that they assisted others in packing the aforementioned safe into the TARGET RESIDENCE TWO. CW 1 stated that they packed the safe down the hallway and up a flight of stairs into a bedroom. CW 1 advised that about a month ago, Wesley attempted to bring the safe down the stairs and damaged the residence. CW 1 stated that Darin repaired the home.

152. CW 1 told detectives that Darin Sumner always used the "speakerphone" option when talking with other individuals on his phone. CW 1 detailed a conversation they observed between Darin Sumner and Ashley Hensley around 4-5 months ago. CW 1 stated that Darin asked how many "envelopes" he had. CW 1 stated that Ashley told Darin there were 11. CW 1 then advised that Darin asked Ashley if there was more, and Ashley said that she got him two envelopes out when he bought the van. CW 1 stated that CW1 was present with Darin Sumner at Brandon's house and was sitting on the porch. CW 1 stated that Wesley brought up the envelope on a four-wheeler, held it up, and put it in Darin's truck. CW 1 indicated that this was the truck that he had traded to Tony Williams. CW 1 then stated that Darin directed them to tear into the envelope and give him the money. CW 1 described this envelope as a bank envelope, and it had twenty thousand written on it. CW 1 stated that Darin then told them to burn the envelope, which they did.

153. CW 1 also stated that about a month and a half ago, they observed a conversation between Darin Sumner and "D.J." (Darin Sumner's son). CW 1 advised that the conversation was on speakerphone and that they observed it. CW 1 stated that D.J. asked Darin for money and Darin replied that he wouldn't have any money until Ashley and Wesley got home. CW 1 indicated that after the police had gone to Brandon's, Darin keeps drugs and money at Ashley and Wesley's because they "don't do dope."

154. During the interview on October 6, 2026, CW 1 provided additional details about the previously discussed event when Wesley Hensley delivered around 3-4 ounces of crack cocaine to Darin's home on or about September 10, 2026. CW 1 detailed this interaction and indicated they were present with Darin Sumner on the porch. CW 1 stated that Wesley

walked up on the porch and threw a brown paper bag in Darin's lap. CW 1 stated that Darin then removed a vacuum-sealed bag from the brown paper bag that contained crack cocaine.

155. Also during the October 6, 2026 interview, CW 1 advised that around two to three days ago "Feller" Back had come to his residence and discussed Darin's involvement in the distribution of crack cocaine.

156. Based on my involvement in the investigation, I know the identities of CW 1 and all three SOIs associated with this investigation. All three of the SOIs and CW 1 have obtained the information provided to law enforcement through their previous and/or ongoing involvement in drug trafficking activities with Sumner or Sumner's associates. The CW, also known as CW 1, has provided information and has worked proactively with law enforcement officers for monetary compensation. I am not aware of any instances in which the information provided by CW 1 or any of the SOIs was false or misleading. For these reasons, I consider CW 1 and the SOIs' information to be reliable.

**Conclusion:**

157. Based on the foregoing, and my experience, training, and involvement in this investigation, I believe there is probable and reasonable cause to believe that both Darin Sumner and Julie Sumner have engaged in, and continue to engage in, an organization involved in the distribution of cocaine base in violation of 21 U.S.C. §§ 846 and 841(a)(1). As a result, I respectfully request that the Court issue a criminal complaint and arrest warrant for Darin and Julie Sumner.

158. Further, I believe that the involvement Darin and Julie Sumner in the distribution of cocaine has generated substantial amounts of U.S. currency, which they maintain at the TARGET RESIDENCE and TARGET RESIDENCE TWO. I also believe that, based on the information provided, it is reasonable that Darin and Julie Sumner have illegal drugs, in particular cocaine base, concealed inside the TARGET RESIDENCE and TARGET RESIDENCE TWO, which would be evidence of their involvement, and the involvement of others, in the distribution of cocaine base. I additionally believe that it is reasonable that the Sumner's maintain receipts, ledgers, and other documents at their residence, which would be evidence of their involvement in the distribution of cocaine base at the TARGET RESIDENCE and TARGET RESIDENCE TWO. For these reasons, I respectfully request that the court issue a search warrant for the TARGET RESIDENCE and TARGET RESIDENCE TWO.

159. Furthermore, as this investigation is ongoing and members of the conspiracy are at large, I believe that the details of this investigation described herein would place the investigation in jeopardy. Therefore, it is requested that this affidavit be and remain sealed pending further order of the Court.

/s/ Zachary Bryson w.p.b. Hanly A. Ingram

Zachary G. Bryson,
Task Force Officer (TFO)
Federal Bureau of Investigation (FBI)

Subscribed remotely per Rule 4.1(b)(2)(A) this ~~18th~~ 13th day of October, 2026.

Honorable Hanly A. Ingram
United States Magistrate Judge
Eastern District of Kentucky